*346 IRVING, J.,
Dissenting.
¶ 20. The majority finds that the circuit court did not err in finding that the decision of the Planning Commission (Commission) and of the City of Gulfport, acting through its Council (City Council), to deny Hillside Terrace, L.P.’s application for approval to construct a multi-family dwelling in a B-2 district zone is supported by substantial evidence and is not arbitrary and capricious. I disagree. In my judgment, the evidence is overwhelming that not only is the decision to deny approval not undergirded by substantial evidence, it is also arbitrary and capricious, because the Commission and the City Council wil-fully and deliberately ignored the provision in the zoning ordinance which sets forth the factors that must be considered in determining whether to grant or deny approval for a permitted use in a B-2 district. Therefore, I dissent. I would reverse and render the judgment of the circuit court and remand this case to the Commission with directions to grant approval to Hillside for construction of the multi-family dwelling complex.
¶ 21. First, it should be made clear that, according to the City’s “Comprehensive Land Use Ordinances,” multi-family dwellings are a permitted use in a B-2 district. The use, however, requires approval of the Commission. It does not require rezoning or any type of special exception. When considering whether to allow a permitted use, the Commission is required to consider certain factors. Specifically, appendix A, section III(J)(l)(b) of the Comprehensive Land Use Ordinances provides, in pertinent part, as follows:
Uses requiring planning approval. The uses listed below [of which multiple family dwellings in a B-2 zone are one] are permitted upon approval of location and the site plan thereof by the planning commission as being appropriate with regard to transportation and access, water supply, waste disposal, and other public facilities, as not causing undue traffic congestion or creating a traffic hazard, and as being in harmony with the orderly and appropriate development of the district [in] which the use is located.
Thus, it is also clear that the determination to approve or disapprove a permitted use cannot be done in a whimsical, arbitrary, or capricious fashion. It must be the result of a deliberate, adjudicative process by the Commission considering the impact of the use on “transportation and access, water supply, waste disposal, and other public facilities, as not causing undue traffic congestion or creating a traffic hazard, and as being in harmony with the orderly and appropriate development of the district [in] which the use is located.” (Emphasis added).
¶ 22. It is noteworthy here that none of the departments of the City of Gulfport that would be potentially impacted by permitting the construction of the multi-family dwellings recommended against it, choosing instead to offer no comment.[4] In fact, one, the fire department, gave its approval, conditioned upon the development meeting all requirements applying to multi-family dwellings. The police department made no recommendation but had “concerns regarding access of traffic to Pass Road.” It, however, was of the opinion that “proper management and security of the complex will alleviate other law enforcement concerns.” With respect to the matter of “access of traffic to Pass Road,” it is sufficient to say that under the ordinance, for a *347 development of the size that was proposed, only one entrance is required.
¶ 23. I am fully aware that neither the Commission nor the City Council was bound by the lack of opposition from the various departments of city government. However, it seems to me that lack of opposition is highly relevant to the question of whether the Commission’s and the City Council’s decisions are based on substantial evidence or are arbitrary and capricious. It is not legitimately debatable that the personnel in the department of traffic and safety should possess more expertise than a commissioner or councilperson relative to the impact that existence of the dwelling units would have on traffic congestion or traffic hazards. The same would be true of the department of public works with respect to its knowledge of the impact that the development might have on the water supply and waste disposal facilities of the city. Yet, as stated, neither of the departments recommended against approval. With respect to the use being “in harmony with the orderly and appropriate development of the district [in] which the use is located,” the Commission’s own staff found:
After reviewing the submitted information, it was determined the proposed apartment development would be consistent with the surrounding areas. There is another apartment complex located west and north of the subject property. This proposed development will potentially provide a transition and buffer area between the single family residents located to the west, and the commercial developments located on Pass Road and 8th Avenue.
The Commission’s staff recommended that approval be granted on certain conditions that, for purposes of this discussion, are irrelevant, except for the recommendation that if the northern portion of the development was going to be used, Hillside would need to schedule a meeting with the Flood Plain Administrator to discuss possible changes in the required base flood elevation.
¶ 24. John Boyd, vice-president of Real-tex Development Corporation (Realtex), the company involved in constructing the development, testified that they sought a use approval, rather than a rezone, to provide “affordable quality apartments for hardworking families.” Boyd explained that this development would replace apartment complexes that were destroyed by Hurricane Katrina. He acknowledged that drainage issues would need to be addressed and assured the Commission that Realtex would comply with the Federal Emergency Management Agency’s (FEMA) advisory base flood elevations. Boyd also stated that Realtex would conduct a drainage study. As for the ability of the tenants to afford the rent that would be required, Boyd stated that the residents must have a verifiable income of at least two and a half times the rent.
¶ 25. The proposed location is adjacent to a gift shop owned by Martin and Dorothy Miazza and an existing apartment complex. They appeared before the Commission through their attorney, David Crane, and argued against approval of Hillside’s application. I quote, verbatim, portions of his presentation to the Commission:
So [the] B-2 district is designed to create a retail business district to service the community. It is not designated to service multi-family residential housing. It is not designed to service residential housing at all.
However, in your code and in your wisdom, you put in there that somebody could apply for permission to build a multi-family complex within the B-2 dis *348 trict. They did that once, and they put in Cypress Lane, 100 units.
Now, somebody is coming in and asking to do it again, and they’re saying because it’s been done before, it should be done again. And I’m going to tell you, that’s the opposite reason that is true. Because it’s been done before, you should look with a particularly jaundiced eye at doing it again because what you would, in fact, do is convert this neighborhood from a B-2 district, business retail district, and sandwich my clients in between two huge multi-family residential complexes.
Now, they’ve been there for 40 years. They bought in a B-2 general business district. Their expectations which were completely justified were to have a business that would thrive in a neighborhood that would be general retail businesses. Their business is not going to fly if it’s sandwiched between two residential complexes, not as it would if somebody came in next door and put another retail business. And that’s what the district is designed to do.
So I don’t think that you can arbitrarily say just because an apartment complex is there now you can put another one because it would, in effect, be tantamount to changing the district, at least where the Miazza stand, from B-2 to R-2. And that’s not what they bought forty years ago.
But in addition to that, your zoning ordinance dictates several factors that you should consider when considering a conditional use under the existing district.
One is transportation and access. The second is water supply, water (inaudible), fire and police protection, traffic congestion or hazards, and in harmony with an orderly and appropriate development of the district.
I’m just going to go by a couple of these, and then start with transportation and access, traffic congestion, and hazards.
* * * 4:
Okay. This property is located immediately adjacent to the intersection of 29th Street and Pass Road. That intersection is not a perpendicular intersection. It comes at a very sharp angle. It’s extremely dangerous right now to come in and out of 29th, quite frankly, t.o get onto Pass Road.
But in addition to that, you’ve got one access going into that apartment complex. They’re asking for permission to build 96 units and 172 parking spaces. So you can assume at least 172 parkers coming in and out of that place on a daily basis.
You’ve got a school across the street, school zone twice a day, and you’ve got a grocery store that has no defined ingress or egress going in and out of Pass Road that is already a congested traffic hazard.
By allowing this to go in, you’re just going to augment the problem that already exists with regard to traffic.
And there is too much limited access. You just went through a seminar on smart growth. One of the things I’m sure they told you is that you would have multiple access. What they’re trying to do is build an island community unto itself, one entrance, nothing else but high density apartment living. It’s a no mixed use with this whatsoever. There’s no access from one place to the other. And, in fact, it’s just limited to that single entrance coming off of Pass Road.
I’ve already spoken about the harmony with the orderly and appropriate development of the neighborhood.
*349 The Miazzas bought this property 40 years ago. They have justified expectations to have it as a business district. Quite frankly, if you took that away from them, that would be tantamount to taking their property without any compensation under the Fifth Amendment. But then last but not least, fire and police protection. And this addresses the crime issue. And I know that they’re telling you that this is not subsidized housing. Nonetheless, they’re talking about voucher housing. And I can tell you that the voucher program is designed so that you can scatter that subsidized housing throughout the community rather than cluster it in high density living. The reason is, is when you live in a high density low income environment, unfortunately, it engenders an atmosphere for the cultivation of crime. Nobody wants that, and that’s nobody’s intention when they go in. But if you look at the projects in New Orleans, you look at the projects that we’ve had here, you see a high density of crime in those neighborhoods.
The logical reason is quite sociological. If you’re an eight-year-old, and you see nothing but poverty around you and nothing but crime around you, you have no desire to go out and do something better for yourself.
If you take a voucher, and you go live across town, and you live with people who do have maybe a little different set of values than the people you’re living next door to, you see an opportunity for growth and an opportunity of escape. There will be no such opportunity in this complex. People are going to live, and they’re going to see crime, and they’re going to create crime. I think it’s an unfortunate truth, but it is.
In addition to his oral argument to the Commission, Crane presented a letter which summarized his argument regarding three of the factors to be considered by the Commission: (1) transportation and access/traffic congestion and hazards, (2) harmony with the orderly and appropriate development of the district, and (3) fire and police protection.
¶ 26. No other person or entity spoke against approval. Thereafter, various commissioners weighed in with questions for Boyd:
[STEPNEY]: This property here, I’ve been across it since back in the sixties. And I’m telling you, it’s going to flood. Just the other week, the rain we did have, it had about eight or ten (inaudible). This property here, like she just told you, we had this before, I know because the property just down below, the school where my wife works, and when it rains, you can’t stop it.
⅜: ⅜ ⅜ ⅜
Don’t get me wrong. I am not fighting the government. That particular property in there, I just can’t see it, I’ll be frank with you. I’m not fighting your proposal. I want you to find — I’d like you to maybe try to find somewhere else where you can really go ahead and try to put up a good.... But that property there, no I just can’t see it.
⅜ * * *
[BOYD]: The problem is, you do not have an abundance — you certainly don’t have an abundance but you have very few zoned multi-family. And I suggest to you that no one here is listening to the hardworking families who need a place to live.
[KEYES]: We’ll take exception to that, sir.
[STEWART]: Yes.
*350 [ALLEN]: Okay. Let’s deal on this hardworking family. The income restrictions. Is there a minimum and maximum, or just a maximum?
[BOYD]: There is a maximum. On the minimum side, you must have an income of at least two and half times the rent. There’s a maximum by HUD, but there’s an internal screening criteria that the family must have an income two and a half times the monthly rent.
[ALLEN]: So basically they can have an income of less than a thousand dollars a month.
[BOYD]: For the one bedroom, the lowest, the three hundred fifty-four, yes, two and a half times.
[ALLEN]: And I’m not speaking — I’m just trying to get.... When we say income, is that income from—
[BOYD]: Verifiable income from employment.
[ALLEN]: Are we talking Social Security, unemployment, welfare? What are we calling income? Because you used the term hardworking families, so let’s clarify what we’re describing as income.
[BOYD]: Verifiable income. I would suggest to you that a family on disability, that can be shown as income. Section VIII vouchers don’t show up as income, but the resident has to make up the gap between what the voucher is and the rent.
[ALLEN]: You consider verifiable income anything they have coming in; right?
[BOYD]: No gifts. Other than that, generally, yes.
[ALLEN]: Okay. Thank you.
[BOYD]: The situation we’re in tonight is I would propose that you put conditions on the use approval that the drainage is all worked out through the planned building.
[ALLEN]: That’s a given anyway. You aren’t going to get a building permit unless you work the drainage out.
[KEYES]: But let us say this after hearing Lorraine [Santo]. We do appreciate your presence, and we hope that we can accommodate you in some way. However, we must say, you know, that again this is not the place. And it’s not because of you. It’s the area. What you’re building, you know, that sounds fabulous according to Lorraine, and we trust that that particular piece of property is not the property that you really want. We know that. We’ve already seen that property.
¶ 27. Thereafter, the Commission members, without any discussion of any of the factors that are, by the express provisions of the ordinance, required to be considered, denied approval by a vote of four to two. As stated, section III(J)(l)(b) of the land use ordinance requires that the Commission consider “transportation and access; water supply; waste disposal; and other public facilities, as not causing undue traffic congestion or creating a traffic hazard; and as being in harmony with the orderly and appropriate development of the district which the use is located.”
¶ 28. Based on these facts, I would find that there is a lack of substantial evidence to support the Commission’s refusal to grant permission for the development of the multi-family dwelling complex in the B-2 district. Therefore, I would also find that the Commission’s denial of Hillside’s request is arbitrary and capricious.
¶ 29. I would also find that the City Council, which affirmed the Commission’s decision, acted without substantial evidence to support its decision, as its decision was based on the record developed *351 before the Commission, even though the City Council heard arguments from interested parties, including Hillside’s and the Miazzas’ attorneys. Thereafter, various councilpersons commented on Hillside’s request for permission to develop the multifamily dwelling complex:
[NALLEY]: Thank you, Mr. Chair. I won’t subject everyone in here to a dissertation on tax credits, because I think most of you probably (inaudible, train passing).
However, since it was brought up by the first gentleman who spoke and also in Mr. Reilly Morse’s letter to us, I just would like you to know that my intention is not to stop housing-credit projects altogether. It was listed in this letter [that] halting affordable housing developments is not the solution to the prevailing housing shortage, and you are correct. But let me tell you a little bit about Barbara Nal-ley. I was raised on a farm two miles down a dirt road in a farm house with no indoor plumbing until I was 13 years old. My grandparents lived in projects all of their entire life. My mother was raised there. My aunt raised her children there. I visited my grandparents every Sunday in the housing projects in a small town in Georgia.
I have sympathy for all of those who are less fortunate than me. However, what’s happening under the GO Zone is something totally different than what happens under annual tax credits each year. It is like a feeding frenzy. Under the last round, 1,071 units were approved in Gulfport for 12 developments for a period ending February 15. On the current round ending March 9, 14 applications were applied for in the city of Gulfport for 1,954 units. Six applications on the city infrastructure, burdens on our streets, 860 units.
Under this same application ending 3/9/07, only four applied for in Biloxi, three in Ocean Springs, five in Bay St. Louis, one in D’Iberville, four in Waveland, three [in] Pass Christian, one in Long Beach, one in Gautier, [and] one in Moss Point.
My efforts are not to stop affordable housing or Section 8 housing. My efforts are to under this GO Zone to perhaps implement a better policy with the Home Corp. under this next round of development.
And we were told in a meeting that we had yesterday why not just basically — and I’m paraphrasing — if we go ahead and approve these, then we as a council when it gets times like this or permitting, we will have the ability to say no. And my objection to that is obviously we haven’t.
We have another development that was brought before the planning commission. They were denied for reasons of location. They were brought to us. It was denied for reasons of location being close to a creek bed, close to an interstate, close to a shopping mall that is projected to go in. And although it was denied both times, it’s being brought back to planning again.
So I wonder if we have the ability to say no. Do we need 26 in the city of Gulfport? Is that saturation?
And I know that you’re going to sit out there, gentlemen, and say we probably won’t get all of these 14. We may not. But I ask [sic] the Home Corp., and they certainly are within their rights to approve them all should they choose to do so.
Saturation. It’s going to affect our taxes. It’s going to affect our schools. *352 It’s going to affect everything around us if we have this many. I’m not trying to stop them all.
I have concerns with this project in particular because of the location and because of the transcript. And I know where the location is. I am concerned about putting a housing unit there which is so close where the buyout [sic] was.
People have talked to me. I’ve asked questions. I’ve driven by there. My concerns are not whether we appear in the paper tomorrow as being the first to award a tax credit development because I can tell you, I’ve got one on O’Neal Road called O’Neal Housing, which is very near where I live. And it is a good project. And currently it is an active project which wasn’t damaged.
Do I have a problem with the federal government closing down some of our current housing projects which are fine buildings where people are in brick structures, there is space, they have yards to play in, to sell that property and relocate them to an apartment complex on a creek bed near the interstate? Yes, I have a problem with that.
So do we depend on our federal government to guide us? No, I don’t think we do.
In a given year as a tax credit, the State of Mississippi receives $5 million approximately, and gets 80 applications from across the state. Under GO Zone, that equates to about $37 million a year over three years which is close to over $120 million. That is excessive.
I would like to see it spread more evenly amongst the other cities. I am asking Home Corp. to do that. And I thank you for your indulgence, Mr. Chairman.
* * * *
[HOLMES-HINES]: This is going to be for [the Director of Urban Development,] Larry Jones. Larry, in looking at the transcript, comments by department agencies, engineering, public works, traffic and safety, and building code services is left blank. Fire department makes a comment that they approve as of memo stated in the record for multi-family dwelling. The police department is no recommendation, memo of 1/3/07, but there are concerns regarding access to traffic to Pass Road. Additionally, proper management and security of the complex will alleviate other law enforcement concerns.
My question is: Did these departments submit their comments on this pi'oject?
MR. JONES: No, they did not.
* * * ⅜
[NALLEY]: Can you tell me what the elevation of the property is now?
[ENGINEER CRAIG CARNEY]: It’s about 8 to 20 feet.
[NALLEY]: Can you tell me how much water you had in Katrina on the property or can the property owner tell me?
[DR. LOVELL]:[5] We’ve got the FEMA map if you would like to see that.
[NALLEY]: No. I’d like you to tell me approximately how much-you said that you had water during Katrina. Can you tell me about how much water you had?
*353 [DR. LOVELL]: Approximately one-third of the property, according to the FEMA map.
[COUNCIL MEMBER NALLEY]: On which side of the property?
[DR. LOVELL]: North.
[NALLEY]: And how close are you to the existing apartment complex up there?
[DR. LOVELL]: Which one?
[NALLEY]: The one that’s on, I’m assuming to the west.
[DR. LOVELL]: The property complex to the west is-the correct name is the Cypress Lane Apartments to the west there. What was your question?
[NALLEY]: How many apartments are in that complex to your west approximately?
[DR. LOVELL]: I’m not sure. Maybe 100,120.
[NALLEY]: Are they now rebuilding that complex?
[CONCERNED CITIZEN]: Yes.
[NALLEY]: I know when it came before the planning commission, they were not. Are they now?
[CARNEY]: I’m not sure of the exact status or the extent that they’re rebuilding or how many units they intend to salvage.
[NALLEY]: Okay. Thank you, Mr. Chairman.
[[Image here]]
[HOLMES-HINES]: Mr. Carney, I have a copy of the (inaudible) that mentions about your flood zone. There are two different flood zones in this transcript. And it stated here that the applicant will need to schedule a meeting with the floodplain administrator to discuss possible changes in the required ABFEs. Do you know today what your elevation will be in this area?
[CARNEY]: It’s 16. The ABFE is 16. We’ll be going a foot above that. In some areas, we’ll be three feet above that.
Well, as you go south the land gets higher. So the finished floor elevations are at elevation 20 as you go south closer to Pass Road. As you go further north, the finished floor elevation is 17.
[HOLMES-HINES]: Thank you, sir.
¶ 30. As was the case with the Commission, at the conclusion of the presentations made by the attorneys for Hillside and the Miazzas and the comments and questions from councilpersons, the councilpersons, without discussion, voted to affirm the decision of the Commission. Also, as was the case with the commissioners, none of the questions or comments of the councilpersons, as reflected above, were targeted at the factors, set forth in the ordinance, which determine the propriety of granting or denying the request.
¶ 31. In Town of Prentiss v. Jefferson Davis County, 874 So.2d 962, 964(¶ 6) (Miss.2004) (citing Hooks v. George County, 748 So.2d 678, 680 (Miss.1999)), the Mississippi Supreme Court held that “[u]n-like decisions to zone or re-zone, which are legislative in nature, decisions on request for special exceptions are adjudicative, and a reviewing court subjects such decisions to the same standard as is applied to [an] administrative agency adjudicative decisions.” Therefore, the “decision of an administrative agency is not to be disturbed unless the agency order was unsupported by substantial evidence; was arbitrary or capricious; was beyond the agency’s scope or powers; or violated the constitutional or statutory rights of the aggrieved party.” Id.
*354 ¶ 32. Our supreme court has defined the phrase “arbitrary and capricious,” as follows:
An act is arbitrary when it is done without adequately determining principle, not done according to reason or judgment, but depending upon the will alone, — absolute in power, tyrannical, despotic, non-rational, — implying either a lack of understanding of or a disregard for the fundamental nature of things ... [.] An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settle controlling principles.
Lowe v. Lowndes County Bldg. Inspection Dep't, 760 So.2d 711, 713(¶ 11) (Miss.2000) (quoting Miss. State Dep’t of Health v. Sw. Miss. Reg'l Med. Ctr., 580 So.2d 1238, 1240 (Miss.1991)). In Lowe, our supreme court also provided guidance for determining when an agency has acted in an arbitrary and capricious manner. Id. In doing so, the Lowe court discussed its holding in Mississippi Department of Environmental Quality v. Weems, 653 So.2d 266 (Miss.1995) wherein it noted that the Mississippi Department of Environmental Quality “acted arbitrarily and capriciously by failing to follow clear statutory directives. ...” Lowe, 760 So.2d at 713(¶ 12). The Lowe court further explained:
The Commission’s actions, as stated in its ruling, indicate an arbitrary and capricious reaction. An administrative act is arbitrary and capricious if the agency “entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of any agency expertise.” 2 Am.Jur.2d § 530 at 519 (1994). In addition, the failure of any agency to abide by its rules is per se arbitrary and capricious as is the failure of an administrative body to conform to prior procedure without adequate explanation for the change. Id.
Id. at 714(¶ 12) (quoting Weems, 653 So.2d at 281) (emphasis added).
¶ 33. I agree with Hillside’s argument that the Commission exceeded its authority in inquiring, during the hearing, about the financial viability of the project, exploring its method of financing the project, and its rental rate structure. I also agree with Hillside’s argument that its involvement with Realtex and the Mississippi Regional Housing Authority VIII (MRHA), coupled with the fact that the project would be financed using low-income tax credits, “played a significant role in the Planning Commission’s denial.” I agree further with Hillside’s argument that the ordinance does not grant any power to the Commission to base its decision to deny use on “technical engineering concerns such as drainage” and that the Commission exceeded the scope of its power when it did so.
¶ 34. As the above-quoted exchanges indicate, none of the comments or questions by the commissioners were targeted at the factors that the Commission was required to consider in arriving at a determination as to whether approval should be granted. Therefore, Lowe compels the conclusion that the Commission’s denial is per se arbitrary and capricious. It is clear to me that the Commission’s reasons for denying Hillside’s application are not based on any of the factors that it is required to consider. Although the Miaz-zas’ attorney argued during the hearing before the Commission, and stated in the letter submitted to it, that allowing the development would cause crime to increase in the area, he did not present any evidence by way of statistics or studies from *355 other housing developments reflecting an “atmosphere of cultivation of crime.” Nor did he present any evidence of a general rise in criminal activity in business districts containing multi-family dwellings. Moreover, the socioeconomic status of the tenants of the proposed development is not one of the factors to be considered as a part of the decision to grant or deny the request. In short, I find that the evidence is overwhelming that the motivating factor in the Commission’s denial of Hillside’s request was the prevention of additional affordable housing for low and moderate income persons. The comments and questions from the commissioners leave no doubt that this is the case. Also, the comments and questions from the councilpersons show without doubt that the City Council and the Commission were on one accord in this endeavor.
¶ 35. Therefore, I would find that the decision of the City Council affirming the decision of the Commission is not supported by substantial evidence and is arbitrary and capricious. It likewise follows that the circuit court erred in affirming the decision of the City Council. Consequently, for the reasons stated, I would reverse and render the judgment of the circuit court and remand this case to the Commission to issue the required approval to Hillside for construction of the development.
KING, C.J., MYERS, P.J., AND CARLTON, J., JOIN THIS OPINION.

. According to the Commission’s staff report, the departments of engineering, public works, traffic and safety, and building codes services made no comment.

. Dr. Frank Lovell is one of the owners of the property.